UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DENA MARIE FUREY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| | * | Civil Action No. 19-cv-11514-ADB |
| ANDREW SAUL, | * | |
| *Commissioner of the Social Security* | * | |
| *Administration*, | * | |
| | * | |
| Defendant. | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Dena Marie Furey brings this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Supplemental Security Income ("SSI") benefits. Currently pending are Ms. Furey's motion to reverse the Commissioner's decision denying her SSI benefits, [ECF No. 18], and the Commissioner's cross-motion for an order affirming the decision, [ECF No. 27]. For the reasons described herein, the Court finds that the Administrative Law Judge erred by failing to conduct the analysis required by the Court's previous remand Order and therefore <u>GRANTS</u> Ms. Furey's motion to reverse, [ECF No. 18], and <u>DENIES</u> the Commissioner's motion to affirm, [ECF No. 27].

I.      **BACKGROUND**

A.      **Statutory and Regulatory Framework: Five-Step Process to Evaluate Disability Claims**

"The Social Security Administration is the federal agency charged with administering both the Social Security disability benefits program, which provides disability insurance for covered workers, and the Supplemental Security Income program, which provides assistance for

the indigent aged and disabled."  <u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42

U.S.C. §§ 423, 1381a).

The Social Security Act (the "Act") provides that an individual shall be considered to be

"disabled" if he or she is:

> unable to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or that has lasted or can be expected to last for a continuous period of not less
> than twelve months.

42 U.S.C. § 1382c(a)(3)(A); <u>see also</u> 42 U.S.C. § 423(d)(1)(A).  The disability must be severe,

such that the claimant is unable to do his or her previous work or any other substantial gainful

activity that exists in the national economy.  <u>See</u> 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R.

§ 416.905.

When evaluating a disability claim under the Act, the Commissioner uses a five-step

process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be
> concluded at any step along the process.  The steps are: 1) if the applicant is engaged
> in substantial gainful work activity, the application is denied; 2) if the applicant
> does not have, or has not had within the relevant time period, a severe impairment
> or combination of impairments, the application is denied; 3) if the impairment
> meets the conditions for one of the "listed" impairments in the Social Security
> regulations, then the application is granted; 4) if the applicant's "residual functional
> capacity" is such that he or she can still perform past relevant work, then the
> application is denied; 5) if the applicant, given his or her residual functional
> capacity, education, work experience, and age, is unable to do any other work, the
> application is granted.

<u>Seavey</u>, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

### B.    Procedural Background

Ms. Furey first sought benefits more than a decade ago and is before the Court for the

third time.

Ms. Furey applied for Social Security Disability Insurance ("SSDI") benefits and SSI

benefits on July 16, 2009 and August 6, 2009, respectively.  [R. 265–77].[1]  In her initial

applications, she alleged that she became disabled on December 1, 2005.  [R. 271].  The Social

Security Administration (the "SSA") denied Ms. Furey's applications on December 14, 2009,

[R. 158–63], and again upon reconsideration on July 16, 2010, [R. 164–69].  Thereafter,

Ms. Furey requested an administrative hearing, and a hearing took place before Administrative

Law Judge ("ALJ") Constance D. Carter on June 14, 2011.  [R. 45–105].  At the hearing,

Ms. Furey amended her application to allege an onset date of October 31, 2008, which, because

of her date last insured, resulted in an abandonment of her SSDI claim.  See [R. 48; R. 139].  On

July 26, 2011, ALJ Carter issued a decision finding that Ms. Furey was not disabled.

[R. 136–52].

Ms. Furey sought review from the SSA Appeals Council (the "AC"), [R. 236–42], and on

May 8, 2012, the AC remanded the case.  [R. 153–57].  The AC concluded that ALJ Carter's

hearing decision did not contain "adequate evaluation of the treating source opinion of

Dr. Stephen Kleinman" and used the term "low stress setting," which was impermissibly vague.

[R. 154–55].  On remand, ALJ Carter was instructed to: further evaluate Ms. Furey's mental

impairments; give further consideration to Ms. Furey's maximum residual functional capacity

("RFC") and provide additional explanation regarding assessed limitations; and, if warranted,

obtain additional evidence from a vocational expert regarding the relationship between

Ms. Furey's limitations and her ability to work.  [R. 155].

---

[1] References to pages in the Administrative Record, which were filed electronically at ECF No. 12, are cited as "[R. __ ]."

ALJ Carter convened a second hearing on February 19, 2013, [R. 106–29], and, on March 20, 2013, issued a second decision denying Ms. Furey's claim for benefits, [R. 12–38]. Ms. Furey again sought review from the AC but this time, her request for review was denied. [R. 1–9]. Ms. Furey then filed a complaint with this Court. On September 3, 2015, the Court vacated the Commissioner's decision and remanded the case for further proceedings. [R. 996–1021]. Specifically, the Court found that remand was necessary because ALJ Carter had erred by "inappropriately discounting the opinion of Furey's treating psychiatrist without going through the analysis required when a treating source opinion is not given controlling weight . . . ," "not addressing those portions of a vocational expert's testimony that called into question [Ms.] Furey's ability to engage in substantial gainful activity. . . ," and "improperly making an adverse credibility finding against [Ms.] Furey by conflating her ability to attend school part-time and raise her child with an ability to work full-time, without sufficiently analyzing the similarities and differences between the skills and functional capacity required for each of those tasks." [R. 996–97].

After the Court's remand, a third administrative hearing took place on October 20, 2016 before ALJ Sean Teehan. [R. 897–953]. ALJ Teehan issued a decision on January 4, 2017 denying Ms. Furey's application for benefits. [836–96]. The decision became final when Ms. Furey failed to file written exceptions and the AC declined to independently review the ALJ's decision. See [R. 836–38]. Ms. Furey appealed the decision to this Court but before the Court ruled on the parties' cross-motions to reverse and affirm, the Commissioner requested a remand, and, on February 13, 2018, the Court remanded with instructions that the case be assigned to an ALJ who had not previously been involved in the case. [R. 1622–23]. The Court also ordered the AC to direct the newly-assigned ALJ to "consider the issues raised in this

4

remand as well as prior remands; to evaluate the updated evidence, taking care to acknowledge all treating source opinions in the record, including the 2011 and 2013 opinions of Dr. Kleinman; and to complete the analysis accordingly." [Id.].  The AC provided such instructions.  See [R. 1615–20].

On January 25, 2019, a fourth hearing was held, this time before ALJ Alexander Klibaner.  [R. 1552–1612].  Ms. Furey, who was represented by counsel, appeared and testified at the hearing, as did medical expert Dr. Neli Cohen ("ME Cohen") and vocational expert Michelle Bishop ("VE Bishop").  See [id.].  ALJ Klibaner issued a decision on March 14, 2019, concluding that Ms. Furey was not disabled and therefore not entitled to SSI benefits. [R. 1500–51].  His decision became final on May 14, 2019 and Ms. Furey timely filed a complaint with this Court on July 10, 2019, seeking review of the Commissioner's decision pursuant to section 205(g) of the Act.  [ECF No. 1].

### C.   Factual Background

Ms. Furey was born in July 1978; she was thirty years old when she originally applied for benefits and is currently forty-two years old.  [R. 267].  Ms. Furey has not been employed since her initial application and, although the record is inconsistent regarding the precise details of her prior work history, it is clear that she last worked consistently in the early 2000s as a corrections officer.[2]

---

[2] Ms. Furey's original work history report indicated that she worked as a corrections officer until 2001, [R. 307], but she testified at her first administrative hearing that she worked as a corrections officer in 2003 or 2004, [R. 51].  She also testified that she more recently worked for approximately a month as a food prep at Community Workshops.  [R. 52].  The parties do not dispute the specifics of Ms. Furey's prior work history and, in the decision that is the subject of the instant motions, ALJ Klibaner concluded that Ms. Furey has no past relevant work within the meaning of 20 C.F.R. § 416.963, [R. 1541].

Beginning in 2009, Ms. Furey enrolled at a number of colleges in and around Boston, taking both in-person and online classes and generally attending classes for approximately two-to-three hours per day two-to-three days per week.  See generally [R. 45–105, R. 106–29, R. 897–953, R. 1552–1612].  She earned an associate degree from Bunker Hill Community College,[3] [R. 1208], a bachelor's degree from the University of Massachusetts Boston ("UMass Boston"), [R. 1205–07], and, at the time of her January 2019 hearing, was working towards a master's degree from UMass Boston, [R. 1508].

Ms. Furey has resided in various forms of supportive housing around the Boston area, [R. 61–62 (transitional housing), R. 109 (supporting living), R. 914 (subsidized housing)], and at the time of ALJ Klibaner's decision, resided in Roxbury, Massachusetts, [R. 1759].  She has two children: her son, who is currently eleven years old, has always lived with her, [R. 1513, R. 1540], but her older daughter has lived with Ms. Furey's parents since she was very young, [R. 1598].  Ms. Furey generally gets around by walking, utilizing public transportation, and/or using a private transportation service for individuals with medical issues.  [R. 1591].

### D.    Medical Evidence

Given how long Ms. Furey has been seeking SSI benefits, there is a mountain of medical evidence.  For brevity's sake, the Court provides a concise summary here and directs the reader to the Court's previous Order, [R. 995–1021], as well as to ALJ Klibaner's decision, [R. 1500–51], for a more complete recitation.

---

[3] She also attended Middlesex Community College but did not receive a degree.  [R. 1213].

Ms. Furey suffers from various mental health issues, including depression, anxiety, and post-traumatic stress disorder ("PTSD"), and has dealt with substance abuse.  [R. 1507].[4]  When she was a child, she was a victim of sexual abuse and twice attempted suicide, as a pre-teen and then again as a young adult.  [R. 1514].  Later, she became dependent on heroin.  [R. 1513–14].

In October 2008, Ms. Furey, who was then pregnant with her son, sought assistance in dealing with her heroin addiction at Melrose-Wakefield Hospital.  [R. 390–425].  The next month, after detoxing, she began treatment through the Boston Public Health Commission Opioid Treatment Program.  See [R. 638–709].  As part of her treatment, she took methadone, in gradually decreasing dosages, until January 2015 and again, starting in August 2015, after a relapse, until 2017 (when she began taking other drugs used to treat opioid addiction).  See [R. 638–709, R. 770, R. 1363, R. 1365, R. 2357, R. 2364, R. 2413, R. 2423–30].

In 2009 and 2010, Ms. Furey attended counseling at Bridgewell Counseling Service.  [R. 426–43, R. 462–81, R. 634–37].  She reported, among other things, depression, sleep difficulties, low energy, memory issues, and anxiety; was diagnosed with depression, PTSD, and opioid dependence in early remission, with a Global Assessment of Functioning ("GAF") of fifty-five[5]; and was prescribed multiple medications.  [Id.].

In June 2010, Ms. Furey moved to the Dennis McLaughlin House, an eighteen-month transitional housing program for women in recovery from substance abuse.  [R. 289–90].  Shortly thereafter, she sought help through Massachusetts General Hospital ("MGH") where, on

---

[4] Although Ms. Furey's previous claims for benefits were premised exclusively on mental health issues, in connection with her most recent hearing, she also alleged back pain from degenerative disc disease.  See [R. 1507].  ALJ Klibaner concluded that her alleged back pain was not a severe impairment.  [Id.].

[5] GAF is a scale used to rate how serious a mental health issue is.  The fifty-one to sixty range corresponds to "moderate symptoms."  See [R. 438].

July 30, 2010, she underwent a psychiatric diagnosis interview with Tracey Moriarty,[6] a

Licensed Independent Clinical Social Worker ("LICSW") affiliated with MGH.  [R. 568–74].

Based on this interview, during which Ms. Furey reported her history of substance abuse, sexual

abuse, anxiety, and difficulty sleeping, Ms. Moriarty diagnosed opioid dependence and PTSD

and assigned a GAF of fifty-five.  [Id.].  Following this interview, Ms. Furey began therapy with

Ms. Moriarty, attending sessions regularly from August 2010, [R. 568], through July 11, 2014,

[R. 1393–95].  In September 2010, Cally Woodward, a board-certified advanced practice

registered nurse at MGH began managing Ms. Furey's medication.  [R. 548–50].

Ms. Woodward diagnosed Ms. Furey with a history of polysubstance dependence (sustained full

remission), a mood disorder, and PTSD, and prescribed medication.  [Id.].  In March 2011,

Dr. Stephen Kleinman, a psychiatrist at MGH, replaced Ms. Woodward in managing Ms. Furey's

psycho-pharmacological treatment.  [R. 589–90].  After an initial mental status examination, he

diagnosed Ms. Furey with polysubstance abuse (in remission) and a mood disorder, and altered

her medication.  [Id.].  After a subsequent session, Dr. Kleinman added a diagnosis of panic

disorder.  [R. 586].  Ms. Furey continued to see Dr. Kleinman for psycho-pharmacological

management until June 2014.  [R. 1396–97].

     Together, Dr. Kleinman and Ms. Moriarty completed a Mental RFC Assessment of

Ms. Furey on May 18, 2011.  [R. 626–33].  In the assessment, they opined, among other things,

that: Ms. Furey's "mood continue[d] to be unpredictable and interfer[ed] with daily activities

despite medication compliance," [R. 627]; she "demonstrate[d] difficulty concentrating during

session, she often los[t] her train of thought and forg[o]t[] what she is going to say," [R. 628];

_____

[6] In 2011, Tracey Moriarty changed her name to Tracey Davey, and her last name appears as
Davey in the later-dated portion of the record.  For ease of reference, she is referred to as
Moriarty throughout this opinion.

her impairments or treatment would cause her to be absent "more than three times a month" from work, [R. 629]; she had poor or no ability to "maintain attention for two hour segments" or "respond appropriately to changes in a routine work setting," [R. 630–31]; and that she had only a "fair" ability in a number of categories, including "complet[ing] a normal workday and workweek without interruptions from psychologically based symptoms," "perform[ing] at a consistent pace without an unreasonable number and length of rest periods," and "deal[ing] with normal work stress," [id.].  According to Dr. Kleinman and Ms. Moriarty, Ms. Furey had multiple "marked" functional limitations.  [R. 632].  About a year-and-a-half later, Dr. Kleinman and Ms. Moriarty wrote a letter updating their assessment of Ms. Furey in which they noted that although she had made progress and succeeded in school, she "would have difficulty holding a full time work position" because "she would be unable to sustain the kind of concentration and focus [necessary] for an 8 hour work day or a 40 hour work week."  [R. 834–35].

After Dr. Kleinman retired in June 2014, Ms. Furey began seeing Dr. Gregory Acampora, another MGH psychiatrist.  Dr. Acampora diagnosed her with major depressive disorder, panic disorder with agoraphobia, PTSD, nightmare disorder, opioid dependence, and polysubstance dependence, and prescribed various medications.  [R. 1382–87].  While seeing Dr. Acampora, Ms. Furey had an opioid relapse; Dr. Acampora treated it, first with Suboxone and, when that proved ineffective, with methadone (from which Ms. Furey had previously tapered).  [R. 1346, R. 1348, R. 1330, R. 1473].  Ms. Moriarty also left MGH in 2014, and was replaced by Nancy Landry, another MGH-affiliated LICSW.  See [R. 1430].  In October 2016, Ms. Landry wrote a letter regarding Ms. Furey that Dr. Acampora co-signed.  [R. 1453–54].  In the letter, Ms. Landry opined, among other things, that while Ms. Furey "[wa]s able to attend school part time, given the severity and lack of predictability of her symptoms, she would have a very difficult time

9

maintaining full time employment" because "[f]ull time employment would be significantly interrupted by her symptoms."  [Id.].  Ms. Landry wrote another letter in December 2018, [R. 2571], which Dr. Acampora signed and subsequently endorsed, [R. 2572], in which she said that Ms. Furey "suffer[ed] symptoms from [her] disorders daily which severely affect[] her daily functioning and make[] her unable to maintain full time employment."  [R. 2571].

Throughout her treatment at MGH, Ms. Furey's symptoms varied in severity.  Generally speaking, increased external stress correlated with more severe symptoms and, conversely, decreased external stress correlated with less severe symptoms.  Compare [R. 558–59 (panic attacks associated with school starting), R. 760 (anxiety about SSA benefits hearing), R. 791–93 (anxiety about moving), R. 1315 (anxiety about methadone tapering and relapse)], with [R. 524 ("ok" mood and increased comfort with schoolwork after settling in at school), R. 578–80 (good mood after beginning a new friendship), R. 1427 (better sleep and satisfaction with medication)].

### E.     January 2019 Hearing

On January 25, 2019, ALJ Klibaner conducted a hearing at which Ms. Furey, her counsel, ME Cohen, and VE Butler appeared.  [R. 1578–1612].

ME Cohen testified first, answering questions from both ALJ Klibaner and Ms. Furey's counsel.  [R. 1560–87].  Based on her review of Ms. Furey's medical records and college transcripts, she opined that: anxiety is Ms. Furey's most consistent symptom, [R. 1562]; her ability to concentrate, persist and maintain pace fluctuates between mildly and moderately impaired, [R. 1564]; her ability to interact with others is mildly-to-moderately impaired, [R. 1565]; her ability to adapt or manage herself is mildly-to-moderately impaired, [R. 1565–66]; her treatment has improved her symptoms, [R. 1567]; she is capable of maintaining a schedule and consistently showing up for work, [R. 1569]; she is capable of performing "an unskilled job with simple, routine tasks, and occasional interaction with supervisors and coworkers but none

10

with the general public" for forty hours per week, [R. 1570–71], because in a job with "very limited social interaction," she would have only minor limitations on concentration, persistence, and pace, [R. 1573]. When asked whether she disagreed with the opinions in the record that Ms. Furey would be unable to maintain full-time employment, ME Cohen stated that those opinions were offered without sufficient reasoning and were inconsistent with documentary evidence in the record. [R. 1575, R. 1581].

Ms. Furey testified next. [R. 1588–1603]. She stated that she was incapable of working a full-time job because of her unstable mood and that she was uncertain of her ability to maintain even a part-time job. [R. 1588–89]; see also [R. 1602]. She drew a contrast between her ability to succeed in school and her inability to work, noting, among other things, that the consequences of missing or being late to class were not particularly serious; that teachers were accommodating with extending deadlines for assignments; that she was not obligated to participate in class; that she could work on her assignments on her own schedule; that online classes were available which obviated the need for a commute and to have in-person interaction with others; and that classes generally lasted only fifty minutes and occurred only three days per week. [R. 1589–91, R. 1596–97, R. 1600]. When asked about her depression and anxiety, Ms. Furey testified that, on occasion, they interfered with her ability to get her son ready for school and that sometimes she was "scared to go outside." [R. 1591–93]. She added that, when anxiety strikes, it "takes up [her] whole mind," requires her to be alone and go to "a safe space mentally," and can last from thirty to ninety minutes. [R. 1593]. Although she admitted that her symptoms had improved, she stated that she and her therapists were still attempting to determine what triggers her anxiety and that recent changes in her life had brought the anxious "feelings flooding back." [Id.]. As to panic attacks, she testified that they had subsided recently because she can walk her son to

school and no longer relies on public transportation (which was a cause of her anxiety).

[R. 1593–94].  With regard to nightmares, she stated that she still suffers from them and that

when she wakes up, she is unable to get back to sleep.  [R. 1594].  ALJ Klibaner asked Ms.

Furey about her plans for the future and Ms. Furey testified that she hopes to "get stable enough

where [she] can work with at-risk youth in some capacity."  [R. 1596].

 Finally, VE Butler testified.  [R. 1604–08].  She was asked about the kind of work, if any,

an individual could do if that person had Ms. Furey's age and education and could perform work

at "all exertional levels," was "able to carry out detailed and complex tasks," could "carry out

those tasks for two hour periods throughout a 40 hour work week," could "tolerate occasional

interactions with supervisors and occasional superficial interactions with coworkers and none

with the general public," and could "tolerate routine changes in the work place."  [R. 1604–05].

VE Butler identified, as examples, three jobs: kitchen helper, mail clerk, and document

preparer.  [R. 1605–06].  Then, VE Butler was asked whether an individual who was "off task 20

percent of the time," "absent two or more days per month," and/or "had to unpredictably during

the course of the day take an hour or two off, or leave early . . . once a week" would be able to

perform any full-time job in the national economy.  [R. 1607–08].  She testified that an

individual meeting any of those three criteria would be precluded from all employment.  [Id.].

### F. The ALJ's Decision

 On March 14, 2019, ALJ Klibaner issued a decision finding that Ms. Furey was not

disabled under § 1614(a)(3)(A) of the Act.  [R. 1500–51].  Applying the five-step sequential

evaluation process for determining whether an individual is disabled, at step one, ALJ Klibaner

determined that Ms. Furey had not engaged in substantial gainful activity since July 15, 2009, the

date of her application.  [R. 1507].  At step two, he determined that Ms. Furey has the following

"severe" impairments: "depression/adjustment disorder, an anxiety disorder/panic disorder with

agoraphobia/nightmare disorder/post-traumatic stress disorder, and drug and alcohol abuse (Opioids)."[7]  [Id.].  At step three, he determined that Ms. Furey does not have an impairment or combination of impairments that equals a listed impairment.  [R. 1507–08].  In making this determination, he considered listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders) in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 1507–10].  In determining whether Ms. Furey could qualify based on the "paragraph B" criteria, which requires that a mental disorder "result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental function,"[8] ALJ Klibaner found that Ms. Furey had only mild and moderate limitations and, therefore, could not qualify under the "paragraph B" criteria.  [Id.].  As to whether Ms. Furey could qualify based on the "paragraph C" criteria, which requires that a mental disorder be "serious and persistent," ALJ Klibaner found that the evidence failed to establish the presence of the "paragraph C" criteria.  [R. 1510].  Before considering step four of the sequential evaluation process, ALJ Klibaner found the following with respect to Ms. Furey's RFC:

> [a]fter careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to carry out detailed and complex tasks, defined to include semi-skilled tasks that take no more than six months to learn the techniques, acquire the information and develop the facility needed for average performance of these tasks, she can carry out those tasks for 2-hour periods throughout a 40-hour workweek, she can tolerate occasional interactions with supervisors and occasional, superficial interactions with

---

[7] As to Ms. Furey's allegations regarding back pain, ALJ Klibaner found that because the "evidence does not show significant functional limitations lasting 12 months or more," her "back pain/degenerative disc disease is not a severe impairment."  [R. 1507].

[8] The four areas of mental functioning are (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself.  See 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.01(B).

coworkers, she cannot tolerate interactions with the general public and she is able to tolerate routine changes in the workplace.

[R. 1510].

At step four, ALJ Klibaner determined that Ms. Furey has no past relevant work. [R. 1541]. At step five, he found that "considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." [Id.]. Therefore, he found that Ms. Furey was not disabled under the Act. [R. 1542].

**II.      STANDARD OF REVIEW**

This Court has jurisdiction pursuant to section 205(g) of the Act, 42 U.S.C. § 405(g). Section 205(g) provides that an individual may obtain judicial review of a final decision of the Commissioner of Social Security by instituting a civil action in federal district court. See 42 U.S.C. § 405(g). The district court may take a number of actions with respect to the Commissioner's decision. First, under sentence four of section 205(g), the court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." Id. A court's decision under sentence four, however, can be based only on a review of the administrative record of proceedings before the Commissioner. See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147 (D. Mass. 2011) (quoting 42 U.S.C. § 405(g)). If a claimant presents new evidence to the court that was not contained within the administrative record, the court may not consider it, because "[i]f additional evidence is to be considered, it must be by way of remand[]" pursuant to sentence six of Section 205(g). Hamilton v. Sec'y of Health & Human Servs., 961 F.2d 1495, 1503 (10th Cir. 1992). Sentence six permits the court to remand a case to the Commissioner for further proceedings and order the evidence to be added to the record for

consideration.  See 42 U.S.C. § 405(g) ("The court may . . . at any time order additional evidence

to be taken before the Commissioner . . . but only upon a showing that there is new evidence

which is material and that there is good cause for the failure to incorporate such evidence into the

record in a prior proceeding . . . .").

Under section 205(g), sentence four, this Court's review of the Commissioner's decision

is "limited to determining whether the ALJ used the proper legal standards and found facts upon

the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir.

2000).  In conducting such review, the Court must defer to the Commissioner's factual findings,

so long as such findings are "supported by substantial evidence," but the court's review of the

Commissioner's conclusions of law is de novo.  Id.; see also Nguyen v. Chater, 172 F.3d 31, 35

(1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial

evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or

judging matters entrusted to experts.").

> Under the substantial-evidence standard, a court looks to an existing administrative
> record and asks whether it contains sufficien[t] evidence to support the agency's
> factual determinations.  And whatever the meaning of "substantial" in other
> contexts, the threshold for such evidentiary sufficiency is not high.  Substantial
> evidence, this Court has said, is more than a mere scintilla. It means—and means
> only—such relevant evidence as a reasonable mind might accept as adequate to
> support a conclusion.

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (internal quotation

marks and citations omitted).  The Court "must affirm the [Commissioner's] resolution, even if

the record arguably could justify a different conclusion, so long as it is supported by substantial

evidence."  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)

(emphasis added) (citing Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir.

1981)).

"Where a court finds that the Secretary has committed a legal or factual error in evaluating a particular claim, the district court's remand order will often include detailed instructions concerning the scope of the remand, the evidence to be adduced, and the legal or factual issues to be addressed." Sullivan v. Hudson, 490 U.S. 877, 886 (1989).  The Supreme Court has held that "[d]eviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." Id.

## III.    DISCUSSION

Ms. Furey asserts that ALJ Klibaner's determination should be reversed for three reasons: (1) he improperly weighed the available medical opinions, [ECF No. 21 at 14–19]; (2) in making his RFC determination, he gave undue weight to Ms. Furey's academic achievements and other activities of daily living ("ADLs") without sufficiently analyzing the differences between the skills and capacity required to perform work and those required to succeed in school and perform ADLs, [id. at 19–23]; and (3) in making his RFC determination, he failed to adequately account for Ms. Furey's back pain, [id. at 23–24].  The Commissioner contends that ALJ Klibaner's decision should be affirmed because he correctly applied the law and his decision was supported by substantial evidence.  See generally [ECF No. 30].

### A.    Weighing of Medical Opinions

Ms. Furey asserts that ALJ Klibaner gave too little weight to the opinions of her treating doctors, Dr. Kleinman and Dr. Acampora, and too much weight to the opinion of ME Cohen. [ECF No. 21 at 14–19].  The Commissioner maintains that ALJ Klibaner properly weighed the available medical opinions.  [ECF No. 30 at 10–25].

#### 1.    Treating Sources:  Drs. Kleinman and Acampora

Ms. Furey argues that ALJ Klibaner violated the "treating physician rule" by giving too little evidentiary weight to the opinions of her psychiatrists, Dr. Kleinman and Dr. Acampora.

[ECF No. 21 at 14–18].  She further asserts that ALJ Klibaner did not properly weigh the factors

articulated in 20 C.F.R. § 416.927 when deciding what weight to give their opinions.  [Id. at

16–18].  The Commissioner contends that the ALJ properly discounted Dr. Kleinman's and

Dr. Acampora's opinions.  [ECF No. 30 at 21–25].

For claims filed prior to March 27, 2017, the treating physician rule, codified at 20

C.F.R. § 404.1527, states that, "[g]enerally, [the agency will] give more weight to the medical

opinion of a source who has examined [a patient] than to the medical opinion of a medical source

who has not examined [the patient]."  20 C.F.R. § 404.1527(c)(1).  This deference to the opinion

of treating sources, however, is not absolute.  Coggon v. Barnhart, 354 F. Supp. 2d 40, 52

(D. Mass. 2005).  Controlling weight is granted unless the ALJ finds that a treating source's

opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic

techniques" or that it is "inconsistent with other 'substantial' evidence in the record."

Deblois v. Astrue, No. 07-cv-11685, 2008 U.S. Dist. LEXIS 51843, at *16 (D. Mass. June 13,

2008) (quoting 20 C.F.R. § 404.1527(d)(2)).  Even if the opinion of a treating source is found to

conflict only with the opinions of non-treating sources, the ALJ may still reject the treating

source's opinion as controlling.  Coggon, 354 F. Supp. 2d at 54.  When an ALJ is determining

whether a treating source's opinion should be given controlling weight, the opinion "must be

weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927."  Id. at 52 (quoting

Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, 61 Fed.

Reg. 34490, 34491 (July 2, 1996)).  These factors include:

> (1) the examining relationship, (2) the treatment relationship, including the length,
> nature, and extent of treatment and the frequency of examination; (3) supportability
> of the opinion by evidence; (4) consistency with the record; (5) the specialization
> of the treating source, and (6) any other factors which support or contradict the
> opinion.

Id. (quoting 20 C.F.R. § 416.927(d)); see also 20 C.F.R. § 404.1527 (listing same factors).

17

Regulations require an ALJ to "provide 'good reason' for the weight afforded to the opinions of treating sources." Deblois, 2008 U.S. Dist. LEXIS 51843, at *17 (quoting 20 C.F.R. § 404.1527(c)(2)).  The First Circuit has held, however, that an ALJ is not required to "expressly address each of the factors provided in § 404.1527(c)(2)" in explaining how much weight he or she affords the opinion of a treating source. McNelley v. Colvin, No. 15-cv-01871, 2016 U.S. App. LEXIS 10155, at *3–4 (1st Cir. Apr. 28, 2016) ("The ALJ also did not err by failing to expressly address each of the factors provided in § 404.1527(c)(2) in discussing [the treating source's] medical opinions. . . .  He was not required to expressly mention each factor."); see Pelletier v. Astrue, No. 09-cv-10098, 2012 U.S. Dist. LEXIS 34713, at *11 (D. Mass. Mar. 15, 2012) ("Good reasons can be provided by discussing just one [20 CFR § 404.1527(c)] factor.").

Additionally, the Commissioner is bound to adhere to remand orders, and failure to do so is, itself, reversible error.  See Sullivan, 490 at 886.  In its September 3, 2015 memorandum and Order, the Court highlighted the ALJ's error in "inappropriately discounting the opinion of Furey's treating psychiatrist without going through the analysis required when a treating source opinion is not given controlling weight." [R. 996].  In its second remand Order, the Court ordered the AC to direct the ALJ to "consider the issues raised in this remand as well as prior remands" and "to evaluate the updated evidence, taking care to acknowledge all treating source opinions in the record, including the 2011 and 2013 opinions of Dr. Kleinman; and to complete the analysis accordingly." [R. 1622].  The AC did so, instructing ALJ Klibaner to "[c]onsider the issues raised in the prior remand order" and "[g]ive further consideration to the treating source opinions, including but not limited to Dr. Kleinman, pursuant to the provisions of 20 CFR 416.927, and explain the weight given to such opinion evidence." [R. 1618].

In his decision, ALJ Klibaner acknowledged the remand orders and expressly stated that he "further evaluated the treating source opinions of Stephen Kleinman, M.D. and Gregory Acampora, M.D., considered their treating relationships with the claimant and indicated what evidence in the record support[ed] the mental residual functional capacity [he] found." [R. 1503–04].  He also noted that he "considered opinion evidence in accordance with the requirements of 20 CFR 416.927."  [R. 1510].  Despite Ms. Furey's arguments to the contrary, see [ECF No. 21 at 14–18], these sentences are not merely lip service; ALJ Klibaner properly considered Dr. Kleinman's and Dr. Acampora's opinions under the 20 C.F.R. § 416.927 framework.

First, over the course of twenty-six pages, [R. 1513–1538], ALJ Klibaner carefully reviewed Ms. Furey's medical history, citing the dates of, and details from, appointments with each doctor, see [R. 1521–38], and, in so doing, adequately addressed the first two factors under the treating source rule (i.e., the examining relationship and the treatment relationship).  Second, in affording the opinions little weight, ALJ Klibaner explicitly considered the fourth factor (consistency with the record) and identified several inconsistencies.  [R. 1539–40].  For example, ALJ Klibaner contrasted Dr. Kleinman's opinions regarding Ms. Furey's "marked" limitations in the "paragraph B" criteria with Ms. Furey's psychiatric records, which contain evidence of "normal and mostly normal mental status exams" as well as Ms. Furey's ADLs.  [R. 1539].  Similarly, ALJ Klibaner noted that Dr. Acampora's opinion that Ms. Furey would have a very difficult time maintaining full-time employment was inconsistent with Ms. Furey's psychiatric records which reflect, on the whole, a "stable and even mood and normal attention" and indicate "only moderate psychiatric symptoms."  [R. 1540].

With respect to Dr. Kleinman, Ms. Furey argues that her normal mental status examinations are a "snapshot of her functioning at the time of her appointment only" and are therefore not inconsistent with Dr. Kleinman's conclusions that Ms. Furey would miss work and be off-task because of her symptoms.  [ECF No. 21 at 15–16].  Although a mental status examination is a snapshot in time, ALJ Klibaner considered multiple snapshots, over a long period of time and concluded that they were inconsistent with the opinions offered by Dr. Kleinman.  Moreover, in issuing his opinions, Dr. Kleinman made no effort to grapple with Ms. Furey's normal mental status examinations or otherwise provide objective support for his conclusions.  [R. 834–35].  ALJ Klibaner was entitled to afford little weight to Dr. Kleinman's opinions because they were not supported by the record.

As to Dr. Acampora, Ms. Furey makes a similar argument but takes particular issue with the fact that ALJ Klibaner concluded that Dr. Acampora's opinions were unreliable to the extent they were based solely on Ms. Furey's self-reported symptoms because Dr. Acampora's conclusions are supported by contemporaneous evidence.  [ECF No. 21 at 17].  First, where a treating source's opinions on disability status are based on a claimant's subjective description of his or her symptoms, an ALJ may decline to give those opinions controlling weight.  Guziewicz v. Astrue, No. 10-cv-00310, 2011 U.S. Dist. LEXIS 5370, at *19 (D.N.H. Jan. 14, 2011) ("[T]he mere memorialization of a claimant's subjective complaints in a medical report does not elevate those statements to a medical opinion." (quoting Morris v. Barnhart, 78 Fed. App'x 820, 824 (3d Cir. 2003))); Deblois, 2008 U.S. Dist. LEXIS 51843, at *20 ("The ALJ. . . afforded less probative weight to the opinions and functional assessments of both [claimant's physicians] regarding their evaluations that [claimant] is unfit for employment because th[o]se assessments seem to be based on the claimant's subjective complaints alone." (internal quotation marks

omitted)).  Second, the "contemporaneous evidence" that Ms. Furey cites, [ECF No. 21 at 17], is simply additional instances of self-reporting.  Finally, although Ms. Furey is correct that a psychiatric diagnosis will inevitably, to some degree, rely on a patient's self-reporting, [id. at 17–18], that does not mean that ALJs must accept treating psychiatrist's opinions when they are at odds with objective record evidence.

Because ALJ Klibaner addressed at least three of the § 404.1527(c)(2) factors—examining relationship, treating relationship, and consistency with the record—he was not required to further detail his analysis or reasons for giving the opinions of Dr. Kleinman and Dr. Acampora less weight.  McNelley, 2016 U.S. App. LEXIS 10155, at *3–4.  His analysis of the relevant evidence, including the treating sources' opinions, sets forth "good reason" for rejecting those opinions.  See 20 C.F.R. § 404.1527(c)(2); Deblois, 2008 U.S. Dist. LEXIS 51843, at *20 (affirming the ALJ's finding that a treating source's opinion having been based on the claimant's subjective statements was alone a "good reason" for affording that opinion less weight); see Coggon, 354 F. Supp. 2d at 56 (affirming the ALJ's decision to give little weight to a treating physician's opinion where that opinion was determined to be an "advocacy opinion" and inconsistent with other opinions on the record).  ALJ Klibaner's findings as to the opinions of Dr. Kleinman and Dr. Acampora were supported by substantial evidence and are entitled to deference.  See Biestek, 139 S. Ct. at 1154, 1157.

2.    ME Cohen

Ms. Furey next argues that ALJ Klibaner impermissibly gave substantial weight to ME Cohen's opinion without undertaking the six-factor analysis required by § 416.927 and that ME Cohen demonstrated unfamiliarity with the record.  [ECF No. 21 at 18–19; ECF No. 35 at 8–9].  The Commissioner maintains that ALJ Klibaner properly credited ME Cohen's opinion. [ECF No. 30 at 10–21].

With regard to the six credibility factors from § 416.927, Ms. Furey concedes that ALJ Klibaner addressed two of the factors, namely consistency with the record and supportability, in concluding that ME Cohen's "opinion is largely consistent with and supported by the medical evidence of record . . . and [Ms. Furey's] activities of daily living."  [R. 1539]; see also [ECF No. 21 at 18 (Ms. Furey's concession)].  Moreover, it is evident from the transcript of the administrative hearing and the decision itself that he also considered the first (examining relationship), second (treatment relationship), and fifth factors (specialization).  During the hearing, he asked ME Cohen to confirm that she had never treated or met Ms. Furey, which she did, [R. 1560], and, in his decision, he refers to ME Cohen as an "impartial medical expert in psychology," [R. 1512].  Taken together, ALJ Klibaner definitively recognized and understood that ME Cohen had no examining relationship with Ms. Furey, had no treating relationship with Ms. Furey, and was a psychologist.  That he did not separately address these § 416.927 factors by number in a discrete section of the decision is of no consequence.  Thus, ALJ Klibaner appropriately analyzed ME Cohen's opinion.  See Coggon, 354 F. Supp. 2d at 54 ("The hearing officer will consider [the] findings of a State agency medical or psychological consultant [by] evaluating the findings using relevant factors [as it would a treating source opinion.]" (alterations in original) (internal quotation marks omitted)).

As to Ms. Furey's arguments regarding ME Cohen's unfamiliarity with the record, the Court finds them unpersuasive.[9]  Ms. Furey highlights the following: (1) ME Cohen did not

---

[9] Ms. Furey also points to the fact that ME Cohen testified that she did not have "enough information" to opine on Ms. Furey's social interactions with people other than her medical providers and that she did not "know the reason for [Ms. Furey's] decision to attend not [school] full-time."  See [ECF No. 35 at 8].  ME Cohen's candor and recognition that there may be holes in the evidentiary record, however, does not mean that her opinion should not have been afforded substantial weight.

examine Ms. Furey, [ECF No. 21 at 18]; (2) ME Cohen did not hear Ms. Furey's testimony, [id. at 11]; (3) ME Cohen did not mention reviewing the 2012 and 2013 portions of the record, [id. at 18]; (4) ME Cohen overlooked evidence of Ms. Furey's panic attacks, [id.]; (5) ME Cohen did not address Ms. Furey's frequent absence from class or discuss the record's many references to Ms. Furey's decreased concentration, [id. at 18–19]; (6) ME Cohen did not take note of Ms. Furey's doctors' conclusion that her sleep issues exacerbated her anxiety, [id. at 19]; (7) ME Cohen overlooked evidence that Ms. Furey had stopped taking the bus because of anxiety, [id.]; and (8) ME Cohen was unaware of Ms. Furey's school schedule, [ECF No. 35 at 8].

First, that ME Cohen did not examine Ms. Furey is irrelevant.  Under appropriate circumstances, ALJs may afford greater weight to non-examining, non-treating sources than to examining and/or treating sources.  See Quintana v. Comm'r of Soc. Sec., 110 F. App'x 142, 144 (1st Cir. 2004).  Accordingly, having properly conducted the § 416.927 analysis, ALJ Klibaner was entitled to give ME Cohen's opinion greater weight than those of Dr. Kleinman and Dr. Acampora regardless of whether ME Cohen treated Ms. Furey.

Second, that ME Cohen did not hear Ms. Furey's testimony is also of no consequence. ME Cohen's job was to review the objective medical evidence in the record and render an opinion.  See Becoming a Medical Expert, Social Security Administration, https://www.ssa.gov /appeals/me.html  (last visited Nov. 13, 2020) ("The ALJ's primary reason for seeking the advice of a ME is to gain a better understanding of the medical evidence in the case. . . .  You will rarely have the opportunity to question the claimant directly during the hearing."); see also [R. 1560 (ALJ Klibaner noting that ME Cohen's role was to "provide neutral and impartial professional

opinion testimony")].  Given her role, ME Cohen had no obligation to incorporate Ms. Furey's reporting into her opinions.

Third, ME Cohen testified that she reviewed exhibits 1F through 36F.  [R. 1561].  As of the hearing date, those exhibits comprised all the medical evidence in the record and included records from 2012 and 2013.  [R. 1548–51].

Fourth, even if ME Cohen incorrectly testified regarding panic attacks being reflected in the medical record after 2014 generally, she was testifying about school attendance and the fact that she did not see any record of missing class because of panic attacks.  [R. 1578].  Ms. Furey has cited no example of a medical record reflecting that she missed school because of a panic attack after 2014.  See [ECF No. 21 at 18 (citing R. 1250 (no mention of panic attack), R. 1315 (panic attack mentioned in connection with relapse), and R. 1368 (panic attack mentioned in connection with "being in spaces where she feels like she can't escape")].  More generally, given the volume of medical records in this case, it is not necessary or realistic to expect ME Cohen to be intimately familiar with the precise dates of each panic attack.

Fifth, although ME Cohen's testimony regarding Ms. Furey's limitations in concentration did not specifically reference her absence from class or record references to issues with concentration, her overall opinion that Ms. Furey's limitation in concentration, persistence, and pace was mild is supported by the record.  See, e.g., [R. 1528 (noting that concentration was not among neurovegetative symptoms assessed by Dr. Kleinman at July 30, 2013 appointment), R. 1527 (noting that Ms. Furey displayed adequate attention and concentration at January 24, 2013 appointment)].  Moreover, Ms. Furey's counsel could have questioned ME Cohen on class absences and/or concentration issues but elected not to do so.

Sixth, ME Cohen's testimony regarding the connection between sleep disturbances and performance (i.e., that different people react differently) is unremarkable.  [R. 1576–77]. Moreover, the records Ms. Furey cites for the proposition that her doctors concluded that her sleep issues and performance issues were connected are conclusory, [R. 1454 ("Symptoms are worsened by stressors and lack of sleep due to nightmares."), R. 2571 ("Symptoms are worsened by daily stressors and lack of consistent sleep due to nightmares.")], and ME Cohen was not obligated to credit them.

Seventh, ME Cohen's testimony regarding Ms. Furey's ability to ride the bus was accurate.  [R. 1566].  She concluded that Ms. Furey's ability to ride the bus was mildly to moderately impaired because of social limitations on interacting with others, which is entirely consistent with Ms. Furey's testimony that if "the bus was too packed [she] would wait for another one."  [R. 1591].

Finally, ME Cohen testified that she did not know Ms. Furey's school schedule. [R. 1577].  Ms. Furey's counsel could have pointed ME Cohen to evidence in the record indicating that Ms. Furey went to school only part-time or posed a hypothetical question based on that fact but did not do so.  It was not incumbent upon ME Cohen to affirmatively address each piece of evidence in the record.  Moreover, her opinion rests on more than just Ms. Furey's performance in school.  [R. 1571 (discussing medical records)].

Thus, none of the alleged defects with ME Cohen's testimony undermine ALJ Klibaner's decision to afford ME Cohen's opinion "substantial weight" based on his conclusion that it was "largely consistent with and supported by the medical evidence of record."  [R. 1539]; Biestek, 139 S. Ct. at 1154, 1157.

**B.      Analysis of Differences Between Academic and ADL Functioning and
Professional Functioning**

Ms. Furey argues that, in reaching his RFC determination, ALJ Klibaner failed to

adequately analyze the similarities and differences between academic and ADL performance on

the one hand and job performance on the other.  [ECF No. 21 at 19–23; ECF No. 35 at 2–5].  The

Commissioner maintains that ALJ Klibaner's decision reflects the required analysis.  [ECF No.

30 at 15–21].

As discussed above, an ALJ's failure to comply with a remand order is an independent

ground for reversal.  See Sullivan, 490 U.S. at 886; see also Colon v. Saul, 463 F. Supp. 3d 66 (D.

Mass. 2020) (reversing because Commissioner's decision was inconsistent with remand order).

In its September 3, 2015 remand Order, the Court wrote the following:

> [t]he Court additionally remands the case based on the ALJ's finding that Furey
> was not fully credible due in part to her recent success in school and in raising her
> young son.  This is not to suggest that factors such as educational achievement or
> parenting ability may never be taken into account in determining whether a
> claimant is disabled for purposes of receiving Social Security benefits.  The ALJ,
> however, considered Furey's success in school and in taking care of her son without
> sufficient analysis of the similarities and differences between the skills and
> functional capacity required to attend college part-time and to fulfill Furey's
> specific childcare responsibilities, on the one hand, and those required to maintain
> full-time employment, on the other hand.
>
> The mental functioning required to attend school part-time—in Furey's case, three
> mornings a week, with a one-hour break in the middle—and raise her child is not
> necessarily the same as the mental functioning required to work full-time. It is
> conceivable that Furey's mental impairments may not prevent her from performing
> a part-time school schedule or taking care of her son, but that they would preclude
> her from working full-time. Furey testified that she falls asleep during every class,
> rests or sleeps for an hour in between her classes, regularly leaves classes early due
> to panic or anxiety, and misses some classes entirely.  The vocational expert
> testified that a pattern of this type of conduct in a work setting would lead to
> disciplinary action or termination of employment. Beyond acknowledging that
> "attending college is not equivalent to working on a full-time basis" [TR. 30], the
> ALJ does not address or analyze any of these differences, or weigh Furey's
> achievements against her mental impairments to determine whether she has a
> functional capacity that is consistent or inconsistent with maintaining substantial
> gainful employment.  The case is remanded for this reason, as well.

[R. 1019–20].

Here, it appears that ALJ Klibaner did not undertake the analysis required by the Court's remand Order. His recitation of the documentary evidence and testimony regarding Ms. Furey's medical conditions and symptoms, school work, and ADLs is comprehensive, and his conclusion that Ms. Furey is capable of working based on that evidence and testimony may, in fact, be justified, but he fails to take the crucial step in the analytical chain: explaining why Ms. Furey's abilities to perform ADLs and schoolwork suggests an ability to maintain full-time employment. Throughout his decision, he notes aspects of Ms. Furey's academic and personal functioning, including that Ms. Furey is studying for a master's degree, has gotten good grades in school, writes three-to-five-page papers weekly, does research for her classes, and takes care of her young son. [R. 1508–09, R. 1511, R. 1515, R. 1516, R. 1520, R. 1522, R. 1523, R. 1524, R. 1525, R. 1526, R. 1528, R. 1530, R. 1531, R. 1532, R. 1533, R. 1535, R. 1536]. He also acknowledges evidence and her testimony regarding her limitations, including missing (or needing to extend) deadlines, missing class, attending classes part-time and sometimes online, withdrawing from classes, losing focus while studying, leaning on her parents for help with childcare, and sometimes failing to get her son ready for school. [R. 1509, R. 1511–12, R. 1535]. He also linked his conclusions regarding Ms. Furey's limitations in the four "paragraph B" areas of mental functioning with observations about her achievement in school and/or her performance of ADLs:

- "In understanding, remembering or applying information, the claimant has a mild limitation. . . . The claimant testified at the hearing that she is studying Criminal Justice and earning her Master's degree. She testified that she is writing 3-5 pages per week for class and doing research, including Googling articles. This is indicative of her ability to understand, remember and apply information." [R. 1508].

27

- "In interacting with others, the claimant has a moderate limitation. . . . The claimant testified that she is studying Criminal Justice and earning her Master's degree because she wants to work with at risk youth.  This requires an ability to interact with others.  The claimant testified that her schoolwork was on her own terms and that she was able to work with her teachers and explain to them what she deals with.  She testified that she did miss class at times, but that she made it up with classmates' notes.  The claimant's ability to interact with teachers and classmates is indicative of her ability to interact with others.  The claimant also testified that she spends the weekends at her parents' house with her son.  She testified that her sisters and her sister's daughter are also there.  In addition, the claimant testified that she would be able to go to the school library and ask the librarian for help with her research, but that she prefers not to so that she does not have to leave the house because a smell or a sound could bring up trauma from her youth."  [R. 1508–09].

- "With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. . . . The claimant testified at the hearing that she is studying Criminal Justice and earning her Master's degree because she wants to work with at risk youth.  She testified that she is writing 3-5 pages per week for class and doing research, including Googling articles.  The claimant's ability to do this is indicative of her ability to concentrate, persist and maintain pace."  [R. 1509].

- "As for adapting or managing oneself, the claimant has experienced a moderate limitation. . . .  The claimant testified that she is studying Criminal Justice and earning her Master's degree because she wants to work with at risk youth.  She testified that she is writing 3-5 pages per week for class and doing research, including Googling articles.  The claimant testified that she went to UMASS part-time, taking two 50 minute classes twice a week, and that she took the bus to her classes.  The claimant also testified that she has a young son who she takes care of.  In addition, the claimant testified that now that she can walk to school and take online classes, her anxiety is better.  With regard to her daily activities, the claimant testified that she goes to school, she takes care of her son, does her schoolwork, and she watches television.  The claimant then testified that she spends the weekends at her parents' house with her son.  She testified that her sisters and her sister's daughter are also there."  [R. 1509].

He does not, however, evaluate or analyze *why* he reached those conclusions based on that evidence.  In essence, ALJ Klibaner concludes that because Ms. Furey succeeds in school and manages her personal life, she will be able to function at work.  [R. 1541]  In so doing, he fails to discuss the similarities and differences between school and personal life on the one hand and employment on the other.  He does not evaluate or analyze, for example, why an ability to

28

concentrate, persist, or maintain pace *in connection with schoolwork* will translate to an ability to concentrate, persist, or maintain pace *in connection with substantial gainful employment*. Nor does he offer any evaluation or analysis as to the similarities and differences between, for instance, the level of functioning required to write three-to-five pages per week or to care for a young son and the level of functioning required to hold down a forty-hour-per-week job. See [R. 1500–42]. His citations to mental status reports and other medical records in reaching his conclusions regarding the four areas of mental functioning do not fully reflect the school/personal-versus-professional analysis that he was mandated to undertake.

The Commissioner makes a number of arguments but points to no sentence or paragraph of ALJ Klibaner's decision evidencing that he conducted the required compare-and-contrast analysis. See generally [ECF No. 30]. First, the Commissioner seems to argue that because ME Cohen's opinion was "largely consistent with and supported by" various aspects of the record (i.e., medical records, academic achievement, performance of ADLs) and ALJ Klibaner afforded ME Cohen's opinion substantial weight, the decision must be affirmed. [Id. at 10–12, 16]. This argument, however, ignores the long procedural history of this case and the Court's previous remand Order. Whether ALJ Klibaner's decision would be affirmed if it were the first decision in Ms. Furey's case is a question the Court need not consider. ALJ Klibaner was required to issue a decision that accounts for previous remand orders and did not sufficiently do so. See Sullivan, 490 U.S. at 886. Moreover, although ME Cohen testified to the consistency between Ms. Furey's progress notes in her medical records and her education records, that testimony does not clearly speak to the relationship between academic achievement and an ability to work.[10]

---

[10] During the hearing, the closest ME Cohen came to addressing the similarities and differences between school and work was when she was discussing the "concentrate, persist and maintain

29

The Commissioner next argues that ALJ Klibaner did adequately account for differences between Ms. Furey's education and full-time work because he explicitly acknowledged her limitations in school, including that she attended school part-time, missed class, and completed schoolwork on her own schedule.  [ECF No. 30 at 15–16].  Acknowledging a fact's existence and then reaching a conclusion is not the same as analyzing why that fact supports the conclusion.  Nowhere in ALJ Klibaner's decision does he detail why, for instance, Ms. Furey will be able to work eight hours per day, five days per week despite attending class only part time and for no more than two or three hours per day.  See [R. 1500–42].

ALJ Klibaner may well have correctly concluded that Ms. Furey's ability to function academically and personally suggests that she will be able to function professionally.  That his conclusion might be correct, however, does not excuse his failure to provide the analysis necessary to support that conclusion (and to comply with the Court's previous remand Order).  Pursuant to the Court's remand Order, he was obligated to undertake an "analysis of the similarities and differences between the skills and functional capacity required to attend college part-time and to fulfill Furey's specific childcare responsibilities, on the one hand, and those required to maintain full-time employment, on the other hand."  [R. 1020].  He did not do so.

---

pace" area of mental functioning.  [R. 1571–73].  She testified that if "[Ms. Furey] is in a good environment as she shows that she's capable of completing her school, meaning that I don't see any limitation of [sic] concentrate or persist, pace, or understand and remember, as long as she's in a familiar routine environment she has no problems to do that."  [R. 1571–72]  When asked "how does the concentration, persistence and pace play out in a work environment?  Because you said that that was mild to moderate," she answered "[y]es, because I think only when you relate it to interaction to others . . . The thing is just interaction with others that may affect her concentration and persist, pace."  [R. 1572].  She continued, "[t] hat's what I said, you know, when we see how well she's doing in school, when she's in the environment that's comfortable for her."  [R. 1572–73].  This testimony is unclear and fails to substantively address the differences between school and work.

Put simply, ALJ Klibaner was "not free to '[d]eviat[e] from the court's remand order.'"  Colon, 463 F. Supp. 3d at 73 (alteration in original) (quoting Sullivan, 490 U.S. at 886).

## C.    Back Pain

Ms. Furey argues that ALJ Klibaner erred in concluding that her back pain was not a "severe" impairment and that, even assuming his conclusion was correct, he erred in failing to consider her back pain as part of his RFC analysis.  [ECF No. 21 at 23–24].  The Commissioner maintains that ALJ Klibaner properly found that her back pain was not a "severe" impairment, properly considered it in determining Ms. Furey's RFC, and, even assuming he erred, any error was harmless because he concluded that she had other "severe" impairments.  [ECF No. 30 at 26–28].

With regard to Ms. Furey's alleged back pain, ALJ Klibaner wrote:

> The claimant also alleges back pain due to degenerative disc disease.  However, the objective medical evidence of record does not support any limitations lasting 12 months or longer, other than based on the subjective perception of pain.  The claimant's treating records indicated that she had a normal lumbar MRI, despite her allegations of back pain (Exhibit 31F, page 23).  A more recent MRI showed a degenerative change, mostly at L4-5, with a bulging disc and facet arthropathy.  However, there was no central canal stenosis.  During physical examinations, the claimant had a normal gait and straight leg raising was negative.  No abnormalities were noted (Exhibit 32F, page 17).  The incomplete physical therapy records submitted from October 2017 document that the claimant reported intermittent pain with mild limitations, and that continued functional strengthening was recommended (Exhibit 37F).  The evidence does not show significant functional limitations lasting 12 months or more.  As such, the claimant's back pain/degenerative disc disease is not a severe impairment.

[R. 1507].  Further, he determined that Ms. Furey had the RFC to "perform a full range of work at all exertional levels . . . ."  [R. 1510].

"An impairment or combination of impairments is 'severe' if it significantly limits a claimant's ability to perform basic work activities."  Barrientos v. Sec'y of Health & Human Servs., 820 F.2d 1, 2 (1st Cir. 1987) (per curiam) (citing 20 C.F.R. § 404.1520(c)).  Here, ALJ

Klibaner's conclusion that Ms. Furey's back pain was not "severe" is amply supported by the medical records he cites.  See Rodriguez Pagan, 819 F.2d at 3.  Ms. Furey argues that ALJ Klibaner should have concluded that her back pain was severe because there are records demonstrating that she "had an MRI showing degenerative disc changes . . . more than 12 months before the hearing," "had reported back pain since 2013," and had "attended physical therapy."  [ECF No. 21 at 23–24]; see also [ECF No. 35 at 9–10].  Those records, however, do not suggest that Ms. Furey's back pain would significantly limit her ability to perform basic work activities and, therefore, do not undermine ALJ Klibaner's conclusion, which is entitled to deference when, as here, it is supported by substantial evidence.  See Biestek, 139 S. Ct. at 1154.

The parties agree that ALJ Klibaner was obligated to consider Ms. Furey's back pain in fashioning his RFC even if he concluded that it was not a "severe" impairment.  [ECF No. 30 at 26–27; ECF No. 35 at 9].  Ms. Furey argues that he failed to do so.  [ECF No. 35 at 9–10].  Read as a whole, ALJ Klibaner's decision makes clear that he did consider Ms. Furey's back pain in determining her RFC.  First, he acknowledged that he was required to do so.  [R. 1506].  Second, he devoted a lengthy paragraph of his decision to her back pain.  [R. 1507].  It does not matter that the paragraph is in the "severe impairment" section of the decision as opposed to the RFC section.  See Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("[It is proper to read the ALJ's decision as a whole, and . . . it would be a needless formality to have the ALJ repeat substantially similar factual analyses at [multiple] steps . . . .").  Based on the evidence discussed in that paragraph, he concluded that Ms. Furey had, at most, mild limitations as a result of her back pain and incorporated that conclusion (i.e., that there were no exertional limitations) into his RFC finding.  Accordingly, ALJ Klibaner properly considered Ms. Furey's back pain and his RFC finding was supported by substantial evidence.  See Rodriguez Pagan, 819 F.2d at 3.

**IV.       REMEDY**

Having concluded that ALJ Klibaner impermissibly disregarded the Court's September 2015 remand Order, the Court must determine whether the error was harmless and, if it was not, what remedy is appropriate.

      **A.       Harmfulness of Error**

Having found an error, the Court will not reverse if that error was harmless.  <u>Colon</u>, 463 F. Supp. 3d at 75 (citing <u>Perez Torres v. Sec'y of Health & Human Servs.</u>, 90 F.2d 1251, 1255 (1st Cir. 1989)).  Here, the Court cannot conclude that ALJ Klibaner's error was harmless.  The determination of whether Ms. Furey's academic success and ADL functioning reflect an ability to also succeed in the workplace is an important consideration in determining whether she is in fact able to work.  This is especially true given VE Butler's testimony regarding the employment prospects of a hypothetical individual, similarly-situated to Ms. Furey, subject to certain limitations related to punctuality, attendance, and focus.  <u>See</u> [R. 1607–08].  Of course, after conducting the analysis, ALJ Klibaner's conclusion might have been the same, but because he did not conduct the analysis, it is impossible to know how it would have turned out.  For that reason, the Court cannot conclude that the error was harmless.

      **B.       Appropriate Remedy**

Ms. Furey urges the Court to remand the case with instructions to provide benefits.  [ECF No. 35 at 10].  The Commissioner contends that, were the Court to deny its motion to affirm, the Court should remand for further proceedings.  [ECF No. 30 at 28 n.12].

In <u>Seavey</u>, the First Circuit held that "ordinarily the court can order the [SSA] to provide the relief it denied only in the unusual case in which the underlying facts and law are such that the agency has no discretion to act in any manner other than to award or deny benefits."  276 F.3d at 11; <u>see generally</u> <u>Gonzales v. Thomas</u>, 547 U.S. 183, 186 (2006) (noting that in

reviewing agency decisions, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation" (quoting I.N.S. v. Ventura, 537 U.S. 12, 16 (2002))).  Although the First Circuit recognized that other "circuits have exercised what [it] view[ed] as a form of equitable power to order benefits in cases where the entitlement is not totally clear, but the delay involved in repeated remands has become unconscionable," it has declined to "decide the extent of any such equitable limits."  Seavey, 276 F.3d at 13.

This is not a case "in which the underlying facts and law are such" that the SSA has no discretion.  See Seavey, 276 F.3d at 11.  As discussed above, ALJ Klibaner's decision may well have been correct; his error was failing to adequately support his conclusion with analysis as required by the Court's previous Order—not rendering a decision wholly inconsistent with the facts and law.  Under these circumstances and absent clear guidance from the First Circuit regarding when a limited remand is appropriate, the Court declines to exercise its equitable powers to order such a remand here.

That is not to say that the Court is unsympathetic to Ms. Furey's situation.  She initially applied for benefits in 2009, more than eleven years ago.  Moreover, she has been subject to four administrative hearings, one appeal before the AC, and three appeals before this Court (including this one).  It is regrettable that she has not received a definitive decision on her application for benefits despite applying so long ago, especially considering that the SSA system is "meant to provide basic, subsistence benefits to those who need it most."  Rodriguez v. Berryhill, 323 F. Supp. 3d 232, 255 (D. Mass. 2018).  The Court encourages the Commissioner to act swiftly upon remand to avoid unnecessarily lengthening what has already proven to be a "painfully slow process."  Rohrberg v. Apfel, 26 F. Supp. 2d 303, 312 (D. Mass. 1998).

V.	**CONCLUSION**

For the reasons stated above, the Court finds that ALJ Klibaner erred by failing to fully

conduct the analysis required by the Court's previous remand Order.  Therefore, Ms. Furey's

motion to reverse, [ECF No. 18], is <u>GRANTED</u> and the Commissioner's motion to affirm, [ECF

No. 27], is <u>DENIED</u>.  The Commissioner's decision is <u>REVERSED</u>, and the case is

<u>REMANDED</u> for further proceedings consistent with this Order and the Court's and AC's

previous remand orders.

	**SO ORDERED.**

November 13, 2020	/s/ Allison D. Burroughs
	ALLISON D. BURROUGHS
	U.S. DISTRICT JUDGE